IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KAREN MOWATT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 15 C 5521 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of the U.S. Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Karen Mowatt has filed a motion for summary judgment seeking reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits under Section 216(i) and 223(d) of the Social Security Act (doc. # 8). The Commissioner filed her own motion seeking affirmance of the decision denying benefits (doc. # 9). The motions are fully briefed. For the following reasons, Ms. Mowatt's motion is granted and the Commissioner's motion is denied.

### I.

Ms. Mowatt applied for benefits on August 14, 2012, alleging she became disabled on May 31, 2012 due to arthritis/rheumatoid arthritis, hypothyroidism, chronic pain, borderline diabetes, irritable bowl, sleep apnea, sleep disorder, migraines, fibromyalgia, and depression (R. 22, 74-84, 157-65).[2] The application was denied initially on December 7, 2012, and upon

---

[1] On July 24, 2015, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 4, 5).

[2] The administrative law judge's determination states that Ms. Mowatt's application was filed on June 13, 2012 (R. 22). However, the application itself states that it was completed on August 14, 2012 (R. 157-65). That discrepancy is not material to our ruling in this case.

reconsideration on May 10, 2013 (R. 85, 100). Ms. Mowatt, represented by counsel, appeared and testified before administrative law judge ("ALJ") Edward P. Studzinski on March 3, 2014 (R. 22-31). A vocational expert ("VE") also testified (*Id.*). The ALJ issued a written decision on September 22, 2014, finding Ms. Mowatt not disabled and capable of sedentary work with certain limitations (*Id.*). The Appeals Council denied Ms. Mowatt's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-4). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. Part A briefly sets forth Ms. Mowatt's background, followed by her medical record in Part B. Part C discusses the testimony provided at the hearing before the ALJ, and Part D sets forth the ALJ's written opinion.

### A.

Ms. Mowatt was 42 years old at the time of the hearing (R. 44). She completed the tenth grade (*Id.*). Ms. Mowatt's past work includes babysitting and serving as a limousine dispatcher (R. 44-45). Ms. Mowatt claims she stopped working on May 31, 2012 because of her medical conditions (R. 217). This is the same day as her alleged disability onset date (R. 22).

### B.

The medical record begins on December 3, 2007, when an MRI of Ms. Mowatt's right wrist showed an increase in signal in the median nerve correlating to carpal tunnel syndrome (R. 518). Ms. Mowatt underwent surgery in the summer of 2009 to address her wrist pain and carpal tunnel syndrome (R. 319-20). During follow-up visits with Dr. Blair Rhode of Orland Park Orthopedics between July and October 2009, Ms. Mowatt presented with unchanged symptoms and assessments that included wrist pain and carpal tunnel syndrome (R. 311-18). Dr. Rhode

specifically noted Ms. Mowatt presented with pain and numbness on August 31, 2009, median nerve numbness on September 25, 2009, and "moderate base of the thumb pain and palmer (incisional) numbness" on October 19, 2009 (R. 308-13). On October 19, 2009, Dr. Rhode also determined that Ms. Mowatt had permanent restrictions in her right arm, precluding her from using vibratory tools and limiting her to only occasional use of her right arm for pushing, pulling, and repetitive grasping (R. 607). However, despite those limitations, Dr. Rhode determined that Ms. Mowatt could engage in medium-heavy work (*Id.*).

A May 4, 2011 recitation of Ms. Mowatt's past medical history shows that in addition to carpal tunnel syndrome, she has dealt with tendonitis in her shoulder, irritable bowel syndrome, hyperthyroidism, joint pains in her arms and hands, lumbago, and depression (R. 328). She was referred to a pain specialist to address pain associated with her carpal tunnel syndrome and joint pain on March 6 and May 4, 2011 (R. 328, 331, 343). A treatment note from August 16, 2011 indicates that Ms. Mowatt also had achilles tendonitis and plantar fasciitis (R. 355). She was noted to have had a panic attack in a treatment note from November 10, 2011 (R. 357).

Ms. Mowatt was treated by gastroenterologist Dr. Riten Sheth between December 2011 and February 2012 for epigastric pain and esophageal reflux (R. 403-08, 452-53). Dr. Asad Cheema of the Holistic Science & Pain Clinic treated Ms. Mowatt with medication and matrix therapy (electrical stimulation) in 2012 for hand and foot pain, attributing the pain to carpal tunnel syndrome, flat feet, plantar fasciitis, fibromyalgia, and osteoarthritis (R. 410-21). After Ms. Mowatt presented with right knee pain in June 2012, an MRI was performed in July 2012 that showed degenerative changes in the right knee (R. 420, 520). Dr. Cheema performed electrical stimulation to treat Ms. Mowatt's right knee, left elbow, and left shoulder (R. 421-23, 486). Ms. Mowatt had pancreatitis issues in October and November 2012, with her chief

complaint being abdominal pain (R 424-51, 454-79). Dr. Cheema continued treating Ms. Mowatt's right knee and ankle pain with medication and matrix therapy into 2013 (R. 481-509).

Ms. Mowatt was in a motor vehicle accident on April 1, 2013 and was treated in the emergency room for a closed head injury (R. 502-03). Dr. Cheema ordered an MRI that showed minimal acute compression fractures in her thoracic spine and several disc bulges (R. 493-94). A psychological examination with psychologist Kathryn J. Wheeler after the accident on April 13, 2013 showed Ms. Mowatt was dysphoric and anxious, and diagnosed her as having depressive disorder (R. 510-16). Dr. Cheema continued treating Ms. Mowatt with pain medication and matrix therapy (R. 529-37); in addition, she received treatment for pain from Dr. Cary Templin from Hinsdale Orthopaedics (R. 521-25). She reported her pain intensity to Dr. Templin as an eight out of ten on June 18, 2013 (R. 521-23), although an evaluation of an MRI showed her fractures appeared to heal well (R. 524-27). Ms. Mowatt engaged in physical therapy between August and November 2013, eventually showing an increased tolerance for functional activities and the ability to perform activities of daily living with fewer pain complaints compared to before the accident (R. 525, 550-584). Ms. Mowatt continued her care with Dr. Cheema through the date of her disability hearing on March 3, 2014 (R. 600-06, 617-19).

Ms. Mowatt reported taking: Atenolol for high blood pressure; Carisoprodal, a muscle relaxant; Diazepam for anxiety; Ibuprofen for pain; Pantoprazole for GERD; Hydrocodone for pain; Mathscopolamine for GERD; Ondansetam for nausea; Levothyroxine for thyroid issues; Zolpidem to sleep; Cymbalta for fibromaylgia; and Lo Loestrin for fibroids (R. 289). Office visits with Dr. Cheema from 2013 and 2014 indicate Ms. Mowatt was taking medication without side effects or signs of abuse (R. 600-06). The effectiveness of the medications was not discussed in depth, except to note that the medications helped her perform her activities of daily

4

living and that she had ongoing pain issues despite the medications (*Id.*). A consultative examiner, Dr. Charles Carlton, examined her on November 24, 2012, finding that Ms. Mowatt had a normal ability to use both hands (R. 476). State agency physicians also were able to review significant portions of the relevant medical evidence and concluded Ms. Mowatt did not have any severe mental impairments and is physically capable of light work (R. 74-84, 86-99).

### C.

A hearing before the ALJ took place on March 3, 2014 (R. 37-73). Although the precise date is unclear, Ms. Mowatt testified that her last job was babysitting for her granddaughter for approximately five months, but that she was forced to stop because she could not care for her anymore (R. 45). Specifically, her granddaughter fell down the stairs and Ms. Mowatt was unable to pick her up (*Id.*). The record and Ms. Mowatt's testimony indicate that she had stopped working at her previous job as a limousine dispatcher in February 2012 because the pain in her hands and arms became too bad (R. 46, 83).

Ms. Mowatt testified that her carpal tunnel surgery in 2009 was unsuccessful and the pain was worse than before; she has numbness around the incision and pain in her hands (R. 46-47). The ALJ specifically noted the dearth of medical evidence for her carpal tunnel follow up (R. 47). Ms. Mowatt testified that she experienced side effects from most of her medications, including drowsiness and dizziness (R. 59-60). The ALJ expressed skepticism about her difficulties with medication because of lacking supporting medical evidence and because her treatment records noted she was taking her medications without side effects or signs of abuse (R. 48-49, 59-60) (discussing R. 600-06).

Ms. Mowatt testified about issues with swelling in her feet that felt like "somebody cut the skin off and beat the bottom of [her] feet with a spoon" (R. 48). She testified that it had been

5

going on for years, but that the swelling was getting worse, especially at night (*Id.*). Ms. Mowatt testified she had worsening issues for three to four years with her knees swelling and clicking when she tried to walk (R. 49). Ms. Mowatt also testified that she was having pain in her chest and back around the time of the hearing, which medical professionals attributed to her car accident in April 2013 (R. 49-50).

When asked about her irritable bowel syndrome, Ms. Mowatt testified that it is accompanied by severe pain and she gets sick with diarrhea about two to three times per day, for about one half hour each time, roughly five days per week (R. 50-51). She testified that she experienced such attacks every day while she was a limousine dispatcher, which caused her boss to get mad at her for leaving her station for long periods (R. 51).

Ms. Mowatt testified about her other conditions, including that she must use a CPAP machine for her sleep apnea and take a sleeping pill every night (R. 52). Ms. Mowatt testified she still wakes up at last four times per night and experiences significant pain (*Id.*). Ms. Mowatt also testified that she gets migraines about once per month which cause her pain and blurry vision, but that she does not receive treatment for them (R. 53). Ms. Mowatt testified she has loss of vision or dizziness at least twice per week (R. 58). Ms. Mowatt also testified she received treatment for depression from Dr. Aijaz, including a prescription for Xanax (R. 54). When asked about her crying spells during the hearing, Ms. Mowatt testified that they happen at least once per day for the last two or three years (R. 54).

When Ms. Mowatt was asked directly why she believes she is unable to work, she responded that she cannot grip, think straight, or do the work she used to because it is too painful (R. 56). Ms. Mowatt also stated she is easily upset, is unable to sit very long because of knee swelling, and does not sleep through the night because of pain (*Id.*). When asked about what

limitations her doctors have given her, Ms. Mowatt testified that the doctor who performed her hand surgery wrote she could not lift and that she had grasping limitations, but she could not remember the precise limitations (R. 63).

Ms. Mowatt lives in a house with her nineteen-year-old son and eight-year-old son, and she has three grown children who do not live with her (R. 62). She receives monthly income from the railroad company her husband worked for before his recent passing (R. 62-63).

Regarding her activities of daily living, Ms. Mowatt testified she has not taken a bath in years because it is too difficult to sit down and get back up, so she instead must shower (R. 57). She does limited housework, including wiping tables or other tasks periodically, but she must take long breaks in between (R. 57-58). Ms. Mowatt also stated she drives her eight-year-old son to school in the morning, which is two blocks away, but that she does not drive other than that because it hurts too much to grip the wheel and her hands become numb (R. 57, 64). She does not pick him up from school (R. 62). Ms. Mowatt testified that other than taking her son to school, someone is almost always with her (R. 58). When she goes to stores, she uses electric carts, but she testified that gripping the handles hurts too much (*Id.*). She can lift about five pounds, but cannot carry that weight with her (R. 64). Ms. Mowatt testified she wakes up at about 7:00 a.m. to take her medications, after which she lies in bed for about an hour before getting up (R. 60). She testified she does not do anything during the day except alternate sitting and standing (R. 61). She goes down her stairs only once in the morning and back up at bedtime (R. 61). Ms. Mowatt testified she can stand for fifteen minutes if she pushes herself and that she can walk from her house to the mailbox, but even those activities cause her pain (R. 64). She can only sit for about ten or fifteen minutes because of pain (R. 65).

VE Bob Hammond testified that Ms. Mowatt's past relevant work as a dispatcher for a limousine company was a semi-skilled, sedentary level position (R. 68). The ALJ asked the VE a series of hypotheticals, each one assuming a person of the claimant's age, education, and work experience (*Id.*). In the first hypothetical, the ALJ provided a lengthy recitation of limitations, including lifting and standing limitations (ten pounds occasionally, light weight frequently; standing/walking no more than 30 minutes at any one time, and no more than two hours in a work day; an allowance to alternate positions for five minutes after sitting for 60 minutes; an allowance to sit for five minutes after standing for 30 minutes), postural limitations (no climbing ladders, ropes or scaffolds; occasional climbing of ramps or stairs, balancing, stopping, kneeling, crouching, or crawling; no operation of moving machinery and no exposure to hazardous machinery, except may work near a conveyor belt; no work at unprotected heights; no exposure to flames or bodies of water), and other limitations (moderate deficits of concentration, persistence, or pace; moderate social functioning deficits; limited to simple, routine, repetitive tasks, simple decision-making, no more than minor changes in work setting; no direct public service work; brief and superficial interaction with public) (R. 68-70). The VE testified such an individual could not perform Ms. Mowatt's past work (R. 70). Other jobs available would be an assembler in the eyewear field, bonder in the semi-conductor field, and circuit board screener (R. 70).

For the second hypothetical, the ALJ added the limitation that the individual could use both hands frequently for fine and gross manipulation, but cannot use their hands for more than two thirds of the workday. The hypothetical was clarified to say that the individual could use either hand, whether that be together with the other hand or separately, for two thirds of the workday, so if the job could be done with one hand, they could overlap to cover the whole day

8

(R. 70-71). The VE was asked whether that individual could perform the jobs listed in the first hypothetical, to which the VE responded such an individual could perform the circuit board screener position and the semi-conductor bonder position (R. 71-72). With the limitation that the individual could only do occasional fine manipulation with either hand, whether that be together or separately, all positions were eliminated at all levels (R. 70-72).

### D.

On September 22, 2014, the ALJ issued a written opinion finding Ms. Mowatt not disabled pursuant to 216(i) and 223(d) of the Social Security Act (R. 22-31). In evaluating the claim, the ALJ applied the five-step sequential process detailed in 20 C.F.R. § 404.1520(a)(4), which required him to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform her past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not equal one of the listed impairments, he must assess and make a finding about the claimant's residual functional capacity ("RFC") before moving on to Step 4. *See* 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at Steps 4 and 5 whether the claimant can return to her past work or different available work in the national economy. *See* 20 C.F.R. § 404.1520(e)-(g). The claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *See Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the ALJ finds the claimant to be disabled at any point in the process, he must determine whether the disability continues through the date of the decision.

At Step 1, the ALJ found that Ms. Mowatt had not engaged in substantial gainful activity since May 31, 2012, the alleged onset date (R. 24). At Step 2, the ALJ found Ms. Mowatt had the following severe impairments: post-surgery carpal tunnel syndrome, osteoarthritis and/or degenerative joint disease in the knees and spine; sleep apnea; and depression (R. 24). At Step 3, the ALJ concluded that Ms. Mowatt's impairments or combination of impairments did not meet or medically equal the criteria of any listed impairment, specifically identifying Listing 1.04 (disorders of the spine) and Listing 12.04 (affective disorders) (R. 25). The ALJ considered Ms. Mowatt's obesity, standing five feet, nine inches tall and weighing 230 pounds, and found that the evidence did not reflect that her obesity, individually or in combination with her impairments, resulted in a listing being met or medically equaled. The ALJ then found that Ms. Mowatt had the RFC to perform sedentary work, but had significant limitations on her ability to stand, sit, perform various tasks, engage in difficult tasks, and interact with the public (R. 26). Specifically relevant is the ALJ's limitation to "use either or both hands frequently for fine and gross manipulation, but cannot use her hands more than two-thirds of the workday, and cannot perform forceful torqueing or grasping or use of vibrating hand tools" (*Id.*). At Step 4, the ALJ found that Ms. Mowatt could not perform her past work (R. 29). At Step 5, the ALJ found that Ms. Mowatt was not disabled because she could perform the jobs of circuit board screener and semi-conductor bonder, as described by the VE at the hearing (R. 30).

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). This Court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence. *Scheck v. Barnhart*,

357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion. *Pepper*, 712 F.3d at 362. While this standard does not require an ALJ to evaluate every item of evidence in the record, it does require that he grapple with evidence that may run counter to his conclusion: cherry picking only the favorable evidence is not sufficient. *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). In asking whether the ALJ's decision has adequate support, this Court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Ms. Mowatt's challenge is limited; she contends that the ALJ committed reversible error by failing to address Dr. Rhode's opinion from 2009 that she suffered from permanent right hand impairment and by ignoring evidence of her emotional frailty (doc. # 8-1: Pl.'s Mem. at 8-14). The Commissioner counters that the ALJ reasonably found Ms. Mowatt could use her right hand frequently, and that her argument that the ALJ ignored evidence of her emotional frailty lacks merit (doc. # 10: Def.'s Mem. at 3-12). For the following reasons, we agree with Ms. Mowatt that the ALJ insufficiently addressed evidence of her right hand impairment, and thus need not address Ms. Mowatt's other arguments.

### A.

Ms. Mowatt contends that the ALJ erred in fashioning an RFC that failed to properly incorporate all limitations expressed by Ms. Mowatt's treater, Dr. Rhodes, in violation of SSR 96-8p and 20 C.F.R. § 404.1527 (Pl.'s Mem. at 9). Specifically, Ms. Mowatt contends that the ALJ did not consider the permanent restrictions found by Dr. Rhodes on Ms. Mowatt's ability to push, pull, and grasp repetitively (*Id.*). The Commissioner responds that the ALJ appropriately acknowledged Dr. Rhode's report that expressed that limitation, but discredited it because it was

"outdated" (Def.'s Mem. at 3-4). The Commissioner alternatively argues that if Dr. Rhode's opinion was insufficiently addressed, that shortcoming was harmless for two reasons. *First*, the Commissioner notes that even if Dr. Rhode were correct in determining that Ms. Mowatt could use her right hand only occasionally, it would not affect the outcome because the VE testified that the jobs he identified can be performed one-handed (*Id.* at 6-7). *Second*, the Commissioner asserts that no reasonable ALJ could accept that the limitations Dr. Rhode identified in 2009 were permanent, when Ms. Mowatt worked for several additional years as a limousine dispatcher (R. 7-9).

In reply, Ms. Mowatt offers a declaration from the VE stating that either the transcript of his testimony is inaccurate or that he misspoke, because the jobs he identified actually *cannot* be performed one-handed (doc. # 13-1: Hammond Decl.). Ms. Mowatt also argues that a permanent impairment cannot be "outdated," and that it violates the *Chenery* doctrine for the Commissioner to argue that Ms. Mowatt's work as a dispatcher supports the ALJ's opinion when the ALJ did not rely on that evidence as a basis for his ruling (doc. # 13: Pl.'s Reply at 1-11);

Evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1527. The so-called "treating physician rule" requires an ALJ to give controlling weight to the opinion of a social security claimant's treating physician if it is well-supported by and not in conflict with other substantial medical evidence in the record. 20 C.F.R. § 404.1527(c)(2). If the ALJ rejects the opinion of a treating doctor, he must provide a sound explanation for that decision. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). This explanation must be justified by considering a list of factors, including length, nature, and extent of the treatment relationship, the physician's specialty, the frequency of examination, diagnostic tests performed, and consistency and supportability of the physician's opinion. 20 C.F.R. § 404.1527(c)(2); *Scott v. Astrue*, 647 F.3d

734, 740 (7th Cir. 2011). Further, SSR 96-8p requires that "[t]he adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," and "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."

Dr. Rhode treated Ms. Mowatt between May and October 2009 (R. 307-22). The medical record at issue is dated October 19, 2009, at which time Dr. Rhode indicated that Ms. Mowatt must be limited to occasional pushing, pulling, and grasping, as well as no vibratory tools whatsoever (R. 607). After treating her for those five months, Dr. Rhode indicated "[t]hese restrictions are permanent" (R. 608).

The ALJ's discussion of this opinion is limited to the following:

> There is a work status report that appears to be dated in 2009 post-carpal tunnel surgery, reporting the claimant was capable of medium exertion work, with no use of vibratory tools in the right hand (Ex. 26F). Although outdated, such limitation has been accommodated in the residual functional capacity. I found the claimant considerably more limited than this report indicates.

(R. 28). The ALJ's RFC also states: "Further, she [Ms. Mowatt] can use either or both hands frequently for fine and gross manipulation, but cannot use her hands more than two-thirds of the workday, and cannot perform forceful torqueing or grasping or use of vibrating hand tools" (R. 26).

The ALJ did not provide a sound explanation for the decision because a significant portion of the treating physician's treatment record was not addressed. Dr. Rhode opined that Ms. Mowatt was limited to "occasional" pushing, pulling, and grasping. The ALJ made no mention of this limitation in concluding that Ms. Mowatt was capable of using both hands "frequently." As used in the Social Security regulations, "occasionally" means occurring from

13

very little up to one third of the time, and "frequently" means occurring from one third to two thirds of the time. *See* SSR 83-10. We cannot say this difference is of no possible consequence.

The ALJ's assertion that he found that Ms. Mowatt was "considerably more limited" than Dr. Rhode's report indicates (that is, by finding she was not capable of medium exertion work) does not render this shortcoming harmless. Merely because an ALJ asserts that his overall limitation is greater than that found by a treater does not relieve the ALJ of the obligation to address any departures from a treating source's opinion. That is particularly so when, as here, certain of the limitations found by the ALJ were in fact less restrictive than those found by the treater and were central to the RFC and the finding of jobs Ms. Mowatt could perform: specifically, the extent of the limitations on Ms. Mowatt's use of her right hand.

The Commissioner's counter-arguments are unpersuasive. *First*, the Commissioner asserts the ALJ properly considered the medical record, but found it was outdated. While the records may be from three years before the alleged onset date, which is a factor that should be considered under 20 C.F.R. § 404.1527(c) and SSR 96-8p, that alone does not automatically render them outdated. Further, this particular record indicates that the restrictions are permanent, which made it even more important for the ALJ to discuss why that finding by a treater was not given controlling weight. *See Fike v. Astrue*, 11-CV-00168, 2012 WL 1200670, at *8 (N.D. Ind. Apr. 10, 2012) ("By its very nature – 'permanent' – there is no reasonable basis upon which to infer that the restriction somehow expired prior to Fike's alleged onset date").

*Second*, the Commissioner says that Ms. Mowatt's work as a limousine dispatcher for several years shows that there was substantial evidence to support the ALJ's rejection of Dr. Rhode's opinion that Ms. Mowatt's right hand limitations were permanent (Def.'s Mem. at 3-9). However, the ALJ did not justify his decision to ignore the permanent disability portion of Dr.

Rhode's opinion by pointing to Ms. Mowatt's work as a limousine dispatcher, and in fact does not discuss her limousine dispatcher work at all in relation to this record except to acknowledge in other parts of the opinion that she worked until 2012. This creates a *Chenery* issue because it constitutes the type of "impermissible post hoc rationale" that the Seventh Circuit has repeatedly warned against. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)). "*Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself," and the government's reliance on reasons not articulated by the ALJ violates this doctrine. *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) (internal citations and quotations omitted). Thus, the Court may not consider the evidence of Ms. Mowatt's work as a limousine dispatcher as substantial evidence supporting the ALJ's rejection of Dr. Rhode's permanent right hand limitations. We must assess the opinion the ALJ wrote, and not one he might have written. *Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5873793, at *26 (N.D. Ill. Nov. 18, 2011) (citing *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011)).

Moreover, even apart from the *Chenery* issue, this argument fails. The Seventh Circuit has "emphasized that 'employment is not proof of positive ability to work, since disabled people, if desperate (or employed by an altruist), can often hold a job.'" *Banks v. Barnhart*, 63 Fed. Appx. 929, 934 (7th Cir. 2003) (quoting *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998). The mere fact that Ms. Mowatt continued as limousine dispatcher after the medical record noted her permanent limitations does not inexorably lead to the conclusion that no reasonable ALJ could determine the restrictions remained despite her work as a limousine dispatcher. If the ALJ decides that in this case the work as a dispatcher was inconsistent with Dr. Rhode's limitations, he must explain the path of reasoning that leads to that conclusion.

The Commissioner also asserts that Ms. Mowatt makes a selective argument that the report is accurate only with respect to the manipulative limitations, but not that she can perform medium-heavy work. However, the issue is not whether plaintiff on review offers arguments the Commissioner deems as selective, but whether the ALJ sufficiently explained why he rejected a treater's opinion on a point central to the outcome of the case: for the reasons stated above, we conclude that the ALJ failed to do so.

**B.**

The Commissioner alternatively argues that the failure to give a more detailed rationale for Ms. Mowatt's RFC was harmless because the VE testified that the jobs he identified can be performed one-handed, and a limitation to occasional right hand usage would not affect the ability to perform the position.

We note that this is a very unusual situation where a declaration from the VE was attached to Ms. Mowatt's reply, which states that the statement in the transcript that the jobs can be done one-handed was either incorrectly transcribed or the VE misspoke. (*Id.*). The VE states the testimony should read: "Because these two positions can't be done with just one hand, so therefore, they could use a combination of the hands over the course of a shift" (*Id.*). The Commissioner has made no objection to the declaration. If accepted, the VE's correction plainly could affect the ALJ's analysis and the outcome of the case. If Ms. Mowatt was limited to occasional work with her right hand, which would be up to one third of the day, and the alternative jobs in the national economy require two hands to be used frequently, or two thirds of the day, Ms. Mowatt would be unable to perform the positions. Because we remand due to the ALJ's failure to adequately address Dr. Rhode's opinion, on remand the ALJ will have an opportunity to sort out the VE's testimony and its impact on the case.

16

## CONCLUSION

For the reasons set forth above, the Court grants Ms. Mowatt's motion for summary judgment (doc. # 8) and denies the Commissioner's motion for summary affirmance (doc. # 9). We remand the case for further proceedings consistent with this Memorandum Opinion and Order. We reject Ms. Mowatt's request to remand the case to a different ALJ (Pl.'s Mem. at 14).[3] This case is terminated.[4]

ENTER:

_____
SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**Dated: July 21, 2016**

---

[3] No justification was provided supporting remand to a different ALJ.

[4] Given our decision above to remand this case based on the ALJ's failure to appropriately address the treater's medical opinion, we need not address the question of whether the ALJ improperly ignored evidence of Ms. Mowatt's emotional frailty. However, on remand, the ALJ may wish to consider the extent to which Ms. Mowatt's emotional issues should be discussed.